UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JERMAINE SANDERS,

                    Petitioner,                          Case No. 1:22-cv-10957

v.                                                       Honorable Thomas L. Ludington
                                                         United States District Judge
RANDEE REWERTS,

                    Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF
HABEAS CORPUS, (2) DENYING CERTIFICATE OF APPEALABILITY,
AND (3) DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS***

On April 28, 2022, Petitioner Jermaine Sanders filed a *pro se* petition for a writ of habeas

corpus under 28 U.S.C. § 2254. Petitioner challenges the constitutionality of several state

convictions. For the reasons explained below, the Petition will be denied with prejudice, a

certificate of appealability will not be issued, and leave to proceed *in forma pauperis* on appeal

will be denied.

**I.**

Petitioner Jermaine Sanders's convictions arise from a traffic stop and search of his

residence. The following facts from the Michigan Court of Appeals are presumed correct on habeas

review, *see Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009).

> On February 16, 2018, the Jackson Narcotics Enforcement Team (JNET) conducted
> surveillance on an apartment on South Elm Street in Jackson, Michigan. The
> individual under investigation was defendant. On that date, JNET asked a state
> trooper to conduct a traffic stop—for a suspended license—if defendant left the
> apartment.[ ] As requested, the state trooper subsequently followed defendant who
> was driving a maroon Honda Civic. Defendant turned off Elm Street into an
> alleyway behind a party store and several other businesses. The trooper activated
> his siren and later his lights, but defendant initially increased his speed before
> stopping in a parking lot, where he was arrested and his vehicle searched. During

the search, police found suspected marijuana and a house key to the Elm Street apartment.

Police also retraced defendant's route between Elm Street and the parking lot. In the alleyway behind the party store, police found a large sandwich bag containing multiple smaller bags of an off-white substance. Testing on the smaller bags indicated that some of the bags contained a mixture of heroin and fentanyl and others contained cocaine. Video footage from the party store showed that the bag found in the alleyway appeared as defendant drove through the alley followed by the state trooper.

Following the traffic stop, police obtained a warrant to search the Elm Street apartment. In the apartment, police found two firearms and ammunition in the kitchen. In one of the bedrooms, police found substances that later tested positive for cocaine, methamphetamine, and a combination of heroin and fentanyl. There was one large piece of "compressed cocaine" weighing 62.28 grams, but many of the recovered drugs had been portioned into smaller amounts and placed in baggies. For instance, in a camera bag, there were 63 small knotted bags, or knotted corners torn from plastic baggies, of suspected heroin, two of which were tested and tested positive for heroin and fentanyl. The camera bag also contained substances that tested positive for cocaine and methamphetamine. According to an expert in narcotics investigations, the amounts of drugs and packaging were consistent with the sale of drugs as compared to possession for personal use.

With the drugs, police also found materials related to the packaging of narcotics, such as plastic baggies, scales, and razor blades. In contrast, police found no signs of "use paraphernalia," such as needles and pipes. Police also found cash in the apartment: $941 in one room and $1,585 in a second room near the narcotics. Documents bearing defendant's name were found in the apartment, including a lease, receipts, a letter, and a statement showing debit card activity.

During an interview with police, defendant incriminated himself, stating, for example, that he would buy drugs to use and to "flip" in order to then buy more drugs as well as pay for other items such as diapers for his daughter. In a second interview, defendant admitted that one of the guns found in the kitchen had been given to him by a friend. And, when informed that police found drugs in the apartment, defendant asked, "Why didn't [Ruby Canter] move it?" Police then informed defendant that Canter did not know that defendant had been arrested, and defendant responded, "You guys got lucky."

At trial, the defense asserted that the drugs in the apartment did not belong to defendant. In support of this defense, Canter, the mother of defendant's child, testified that she and defendant rented the apartment together in June 2017 but that defendant moved out in November 2017.[2] According to Canter, she did not use the room where the drugs were found, and she was unaware that there were drugs in the apartment. She testified that the drugs probably belonged to two men named "Big D" and "Smoke," with whom Canter had what she described as a "fling."

- 2 -

---

[2] The landlord who rented the apartment to Canter and defendant testified at trial that defendant asked to be removed from the lease after the police searched the apartment. And, although Canter testified that defendant moved out of the apartment, defendant was found in the apartment during visits by police and Children's Protective Services after the police search in February 2018.

*People v. Sanders*, No. 349107, 2020 WL 7310511, at *1–2 (Mich. Ct. App. Dec. 10, 2020).

A Jackson County jury found Petitioner guilty of seven offenses: (1) possession with intent to deliver 50 to 449 grams of cocaine, MICH. COMP. LAWS § 333.7401(2)(a)(iii); (2) possession with intent to deliver less than 50 grams of heroin, *id.* § 333.7401(2)(a)(iv); (3) possession with intent to deliver methamphetamine, *id.* § 333.7401(2)(b)(i); (4) two counts of possession of a firearm during the commission of a felony (felony-firearm), *id.* § 750.227b; (5) felon in possession of a firearm, *id.* § 750.224f; and (6) felon in possession of ammunition, *id.* § 750.224f(6). *People v. Sanders*, No. 349107, 2020 WL 7310511, at *1 (Mich. Ct. App. Dec. 10, 2020). On April 18, 2019, Petitioner was sentenced as a fourth habitual offender to 11 to 40 years of imprisonment for each drug conviction, 5 to 40 years of imprisonment for each felon-in-possession conviction, and two years of imprisonment for each of his felony-firearm convictions. *Id.*

Petitioner appealed to the Michigan Court of Appeals, raising four claims: (1) ineffective assistance of trial counsel; (2) trial counsel labored under a conflict of interest; (3) prosecutorial misconduct; and (4) improper jury because the jury was not drawn from a fair cross-section of the community. *Id.* at *1–10. On December 10, 2020, the Michigan Court of Appeals affirmed Petitioner's convictions.[1] *Id.* Petitioner then applied for leave to appeal to the Michigan Supreme Court, raising the same claims. *See generally* ECF No. 7-17. On January 4, 2022, the Michigan Supreme Court denied leave to appeal. *People v. Sanders*, 967 N.W. 2d 604 (Mich. Jan. 4, 2022).

---

[1] The Michigan Court of Appeals' decision will be discussed in greater detail below.

So on April 28, 2022, Petitioner filed a petition for a writ of habeas corpus in this Court. ECF No. 1. Petitioner raises four claims:

I. Ineffective assistance of trial counsel;

II. Deprivation of his Sixth Amendment right to conflict-free counsel;

III. Prosecutorial misconduct; and

IV. Deprivation of his right to a fairly drawn jury.

ECF No. 1 at PageID.6, 8, 9, 11, 18. Respondent filed an answer arguing that portions of Petitioner's third and fourth claims are procedurally defaulted, and that all the claims lack merit.[2] *See* ECF No. 6.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) constrains federal courts' review of state-court decisions in habeas cases. *Smith*, 962 F.3d at 198. Under AEDPA, a claim that state courts "adjudicated on the merits" is not a basis for habeas relief unless its adjudication: (1) ran contrary to, or unreasonably applied, "clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) rested on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have "independent meaning." *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). A state-court decision

---

[2] This Court need not address Respondent's argument that procedural default bars review of aspects of Petitioner's claims because procedural default is not a jurisdictional bar to review the merits. *Trest v. Cain*, 522 U.S. 87, 89 (1997); *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)) ("[F]ederal courts are not required to address a procedural default issue before deciding against the petitioner on the merits[.]") And here, it is more efficient to proceed directly to the merits of Petitioner's claims. *See Smith v. Nagy*, 962 F.3d 192, 207 (6th Cir. 2020).

is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court law; or (2) confronts a set of facts "materially indistinguishable" from a decision of the Supreme Court and yet arrives at a different result. *Id.* at 405–06. A state-court decision involves an "unreasonable application" of clearly established federal law if it (1) correctly identifies the governing legal rule but unreasonably applies it to the facts of the instant case, or (2) either unreasonably extends an established legal principle to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407.

The Supreme Court has emphasized that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410. And later Supreme Court decisions have interpreted this directive to mean that an unreasonable application "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citation modified). AEDPA "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). But the state court's error must be "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. At bottom, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations omitted).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Id.* And for claims adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

# III.

## A. Ineffective Assistance of Counsel and Conflict of Interest Claim

Ultimately, Petitioner's first and second claims blend together ineffective assistance of trial counsel claims. *See* ECF No. 1 at PageID.26–46. To establish ineffective assistance of counsel, a petitioner must prove (1) that trial "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Under AEDPA, a double layer of deference applies to ineffective-assistance claims: the petitioner must overcome the *Strickland* presumption that his attorney's performance was adequate, and he must demonstrate that the state court's application of *Strickland* was unreasonable. *Kelly v. Lazaroff*, 846 F.3d 819, 831–32 (6th Cir. 2017).

First, Petitioner claims he was denied his right to conflict-free counsel, *see* ECF No. 1 at PageID.34–46, and that counsel was ineffective for failing to withdraw when the conflict became evident, *see id.* at PageID.27. Second, he argues that counsel was ineffective for failing to object to the jury array challenged in his fourth claim and alleged prosecutorial misconduct challenged in his third claim. *See id.* at PageID.27–30. Because the latter argument overlaps with his other claims, this Court will reserve discussion of that argument for the sections addressing the overlapping claims. So this Court will address only the conflict-of-interest claim in this section.

The right to the effective assistance of counsel includes the right to counsel free from conflict. *See Holloway v. Arkansas*, 435 U.S. 475, 483–84 (1978). A claim that a conflict of interest burdened counsel is "analyzed under a modified version of the two-part *Strickland* test for ineffective assistance of counsel." *Moore v. Mitchell*, 708 F.3d 760, 777 (6th Cir. 2013) (citing

*Strickland*, 466 U.S. at 692). First, the defendant must show that counsel "actively represented conflicting interests." *Cuyler v. Sullivan*, 446 U.S. 335, 340, 345–488 (1980). An actual conflict of interest is one "that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). "[T]he *possibility* of conflict is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350 (emphasis added). Second, if an actual conflict burdens counsel, prejudice is presumed. *See id.* at 345–50.

To date, the Sixth Circuit has presumed prejudice only in cases where counsel's conflict arises from concurrently representing codefendants. *See Mickens*, 535 U.S. at 172–74; *see also Stewart v. Wolfenbarger*, 468 F.3d 338, 351 (6th Cir. 2006) ("This Court has consistently held that, for Section 2254 cases, the *Cuyler* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases, including successive representation, the *Strickland* standard applies."). "Multiple concurrent representation 'occurs where a single attorney simultaneously represents two or more codefendants in the same or separate proceeding(s).'" *Gabrion v. United States*, 43 F.4th 569, 578 (6th Cir. 2022) (quoting *Jalowiec v. Bradshaw*, 657 F.3d 293, 315 (6th Cir. 2011)). Here, Petitioner's conflict-of-interest claim does not clearly fall within this body of law.

Petitioner claims that an actual conflict of interest burdened his attorney because she represented a suspected overlapping drug dealer named Anthony Oliver, and that the conflict affected her performance. *See* ECF No. 1 at PageID.34–46. During Petitioner's interview with police, officers asked about his suppliers, including someone named "AD." *See id.* at PageID.34. Petitioner stated that he had grown up with AD—whose real name is Anthony Oliver—and that he was "kind of mad" at AD because AD would not "give [him] a chance." *Sanders*, 2020 WL 7310511, at *3. He believed that "with AD's help[,] he would have been able to 'move' more." *Id.*

On the third day of Petitioner's trial, his attorney informed the court that Oliver had been indicted in federal court on drug charges and that she was representing Oliver. ECF No. 7-8 at PageID.961–62. She suggested that this created a conflict of interest and requested permission to withdraw as counsel. *Id.* His attorney explained that Petitioner's remarks about Oliver could be construed as implicating Oliver in drug sales, raising the question of whether she could inform Oliver about what Petitioner said during the interview. *Id.* at 963–65. The trial court observed that no privilege concerns were implicated because the video interrogation was played in open court. *Id.* at PageID.963. The trial court found no conflict that would necessitate allowing Petitioner's attorney to withdraw. *Id.* at PageID.964.

In a well-reasoned opinion, the Michigan Court of Appeals affirmed the trial court's holding:

> On appeal, defendant now contends that [his attorney's] representation of Oliver created an impermissible conflict of interest that denied him the effective assistance of counsel. Specifically, defendant makes two arguments. First, he asserts that, as a result of her representation of Oliver, [his attorney] refrained from presenting evidence to support Canter's testimony that the drugs found in the Elm Street apartment belonged to Big D and Smoke because such evidence would have revealed Oliver as their supplier. Second, defendant contends that [his attorney] failed to obtain a plea bargain for defendant because a deal for defendant may have required him to incriminate Oliver. Defendant's arguments lack merit.

> To begin with, there is absolutely no evidence that Oliver had anything whatsoever to do with the drugs that resulted in the charges against defendant or that Oliver's criminal charges were in any way connected to the drugs in the Elm Street apartment or to Smoke and Big D. Defendant speculates that Oliver may have supplied the drugs in question to Smoke and Big D, and he posits that [his attorney] could have presented such evidence or cross-examined witnesses about this possibility. But defendant's theory that Oliver supplied the drugs in his apartment to Smoke and Big D simply has no basis in the record. Absent evidence to support his assertion, the conflict between his interests and Oliver's is merely hypothetical, and it is not indicative of an actual conflict. *See Hall*, 200 F.3d at 966. Likewise, this unsubstantiated conflict does not demonstrate that [his attorney] made a choice not to elicit evidence helpful to defendant in order to protect Oliver; indeed, there is no indication such evidence exists.[4] *See McElrath*, 595 F.3d at 631-632.

Moreover, the fact that Oliver's seemingly unrelated drug charges were to be tried in separate proceedings strongly supports the conclusion that [his attorney] did not face a conflict of interest from her representation of both clients. *Cf. Cuyler v. Sullivan*, 446 U.S. 335, 347; 100 S. Ct. 1708; 64 L. Ed. 2d 333 (1980) ("[T]he provision of separate trials for Sullivan and his codefendants significantly reduced the potential for a divergence in their interests."). Indeed, given that the trials were separate, there was no reason for [his attorney] to have had any particular concern about the possible impact of her tactics in defendant's trial on the outcome of Oliver's case or vice versa.[5] *See Burger v. Kemp*, 483 U.S. 776, 786; 107 S. Ct. 3114; 97 L. Ed. 2d 638 (1987). In short, defendant has failed to point to any specific instances in the record to show that, when representing defendant and developing her trial strategy, [his attorney] had an actual conflict that adversely affected her performance. *See Strickland*, 466 U.S. at 692; *Lafay*, 182 Mich. App. at 530.

Alternatively, defendant contends that [his attorney] failed to obtain, or a[t] least explore the possibility of, a plea bargain for him because doing so may have involved defendant's offering evidence against Oliver. There is, however, no evidence in the record to support this assertion. For example, there is no indication that defendant wanted a plea bargain, that he had information about Oliver that would have warranted a plea,[6] that [his attorney] was aware that defendant possessed valuable information about Oliver, that [his attorney] failed to explore the possibility of a plea bargain in defendant's case, or that, more specifically, [his attorney] failed to negotiate for a plea in order to protect Oliver. Equally important, there is no indication that the Jackson County Prosecutor had any interest in bargaining with defendant in exchange for evidence against Oliver. *Cf. Burger*, 483 U.S. at 785 (rejecting conflict-of-interest argument in the context of a plea when prosecutor was uninterested in bargaining). Indeed, there is very little information in the record about the possibility of a plea. At most, before trial, the prosecutor indicated that there were "no offers on this file" and that the case would likely proceed to trial. Later, on the first day trial, defense counsel noted that the case did not settle "because the People's offer was a non offer versus going to trial, same results as far as the potential for punishment." If anything can be drawn from these brief comments, the record suggests that the prosecutor was not interested in giving defendant a "deal." Regardless, defendant's assertions about the potential for a plea, the efforts or lack thereof made by [his attorney], defendant's information about Oliver, and the prosecutor's willingness to enter into a plea have no basis in the record. Absent evidence to support his contentions that [his attorney] failed to explore the possibility of a plea and that the prosecutor would have made a deal with defendant, defendant's claim that counsel's performance was adversely affected by a conflict of interest lacks merit.[7]

---

[4] In addition to his conflict-of-interest claim involving Oliver, in a more traditional ineffective assistance claim, defendant also asserts that counsel failed to investigate and to present evidence to corroborate Canter's testimony regarding Smoke and Big D. But the record simply does not support defendant's assertions that counsel failed to investigate or that there was corroborating evidence available that defense

counsel failed to present. Absent support for the factual predicate of his claim, defendant's ineffective assistance claim fails. . . .

[5] The only concern that [his attorney] identified in connection with her representation of both defendant and Oliver was whether she could disclose the contents of defendant's interview to Oliver. The trial court reasonably rejected this concern, correctly recognizing that materials played in court were matters of public record and not privileged materials. *See Reed Dairy Farm v. Consumers Power Co*., 227 Mich. App. 614, 620; 576 N.W.2d 709 (1998) (concluding materials in lower court file were "public documents" and not privileged materials).

[6] During his interview, defendant alluded to Oliver's moving drugs, but his knowledge of Oliver's activities is at best unclear. Indeed, defendant expressed some anger because Oliver would not allow him to become involved. Given the vagueness of defendant's statements about Oliver during the police interview and defendant's lack of involvement in Oliver's operations, it is not clear what information defendant now believes he could have offered about Oliver.

[7] In attempting to provide evidence to support his argument, defendant points to his police interview, and he asserts that authorities were willing to bargain with him for information about Oliver as demonstrated by police questions during their interrogation of defendant. The fact, however, that police asked defendant about "AD" does not, without more, evince a willingness to engage in plea bargaining. . . . Further, plea bargaining is a matter within the prosecutor's discretion, and the police generally lack authority to bind the prosecutor. . . . There is no indication that police acted on behalf or at the direction of the prosecutor's office during defendant's interrogation. . . . Accordingly, even assuming police wanted information about Oliver, the fact remains that nothing in the record shows any willingness by the prosecutor to enter into a plea bargain with defendant in exchange for information about Oliver. Absent evidence that the prosecutor was willing to plea bargain with defendant in exchange for information about Oliver, defendant's assertion that [his attorney's] performance during plea negotiations was adversely affected by a conflict of interest fails. *See Burger*, 483 U.S. at 785.

*Sanders*, 2020 WL 7310511, at *4–5 (footnotes in original).

Petitioner has not shown that the Michigan Court of Appeals' decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. First, the alleged conflict of interest did not arise from concurrent representation of joint defendants—Petitioner and Oliver were not rendered codefendants simply because they both may have engaged in the drug trade and were investigated by the same task force. Second, Petitioner has not shown that a conflict existed that actually affected defense counsel's performance, rather than a "mere theoretical

division of loyalties." *Mickens*, 535 U.S. at 171. Thus, under *Cuyler*, a presumption of prejudice does not apply.

And Petitioner has not shown that his attorney otherwise performed deficiently. He claims that counsel should have investigated further to determine whose drugs were found in the Elm Street apartment. *See* ECF No. 1 at PageID.44–45. But Petitioner does not identify what else counsel should have done or provide any support for the conclusory claim that the drugs may have belonged to, or been supplied by, Oliver. *See generally id.* Similarly, Petitioner does not demonstrate that his attorney performed deficiently regarding a potential plea deal. During a pre-trial hearing, the prosecutor indicated that there were "no offers on this file." ECF No. 7-4 at PageID.425. Additionally, his attorney informed the court on the first day of trial that essentially no viable plea deal was offered because no offer minimized Petitioner's sentencing exposure. ECF No. 7-6 at PageID.642. As a result, Petitioner's allegation that his attorney could have achieved a better deal if she had not been representing Oliver is wholly speculative. So the state court's decision denying this claim was a reasonable application of Supreme Court precedent.

Relatedly, Petitioner also alleges that counsel was ineffective for failing to withdraw as counsel when the conflict became evident. This argument is unpersuasive. The Michigan Court of Appeals reasonably rejected this claim because counsel had, in fact, moved to withdraw based on the conflict and, in any event, there was no actual conflict necessitating replacement counsel. *Sanders*, 2020 WL 7310511, at *3 n.3.

In sum, Petitioner's ineffective assistance of counsel claim based on his attorney's theoretical conflict of interest lacks merit. Indeed, Petitioner has not shown that the Michigan Court of Appeals' analysis of this claim was contrary to or unreasonably applied clearly established federal law.

### B. Prosecutorial Misconduct Claim

Turn to Petitioner's third claim, his prosecutorial misconduct claim. A prosecutor's misconduct violates a criminal defendant's constitutional rights if it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct entails much more than conduct that is "undesirable or even universally condemned." *Id.* at 181 (internal quotation omitted). To constitute a due process violation, the conduct must have been "so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation." *Washington v. Hofbauer*, 228 F.3d 689, 708 (6th Cir. 2000).

The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (alteration in original). "That leeway increases in assessing a state court's ruling under AEDPA," because the court "'cannot set aside a state court's conclusion on a federal prosecutorial-misconduct claim unless a petitioner cites . . . other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable.'" *Stewart v. Trierweiler*, 867 F.3d 633, 638-39 (6th Cir. 2017) (quoting *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015)).

In his third claim, Petitioner argues that the prosecutor's misconduct denied him his right to a fair trial. ECF No. 1 at PageID.46. He asserts that the prosecutor committed misconduct in the following ways: he introduced improper evidence of Petitioner's relationship to other drug dealers, argued that Petitioner had a propensity to commit crimes based on a prior conviction, appealed to the jurors' sense of civic duty and their emotions, and vouched for law enforcement witnesses. *See id.* at PageID.49–54. Petitioner also contends that the cumulative effect of these multiple errors

denied him a fair trial. *Id.* at PageID.54. And, as noted above, he asserts that his trial attorney was ineffective for failing to object to this alleged prosecutorial misconduct. *Id.* at PageID.30. As explained in turn below, these arguments lack merit.

### 1. Petitioner's Association with Anthony Oliver

First, Petitioner objects to the prosecutor's argument during rebuttal concerning his relationship with Anthony Oliver. *Id.* at PageID.49. Petitioner maintains that the prosecutor concluded that because Oliver was a drug dealer and Petitioner grew up with Oliver, Petitioner must be as well. *Id.* This argument misses the mark.

As the Michigan Court of Appeals observed, the prosecutor *did not* argue that Petitioner is a drug dealer *because of* his association with Oliver. *Sanders*, 2020 WL 7310511, at *6 n.8. Rather, the prosecutor argued that Petitioner's remarks to police—specifically, that Petitioner believed Oliver "was dealing drugs and that [Petitioner] was upset that [Oliver] would not" involve him "because [Petitioner] thought that he could move more product with [Oliver]'s help"—showed that Petitioner implicitly admitted to dealing drugs. *Id.* at *6. So the Michigan Court of Appeals reasonably applied the *Darden* standard when it concluded: "[T]he prosecutor did not engage in misconduct by arguing the relevant evidence" about Petitioner's remarks concerning Oliver "and all reasonable inferences arising from that evidence as it related to his theory of the case." *Id.*

### 2. Use of Petitioner's Prior Conviction

Second, Petitioner objects to the following portion of the prosecutor's rebuttal argument:

> Let's talk about the prior conviction first. You're going to get an instruction as to that prior delivery of cocaine to Lieutenant Cook and why that's important. You can use it for three reasons. You can use it to establish his knowledge of the drugs. You can use it to establish his intent, that specific intent to deliver. And you can use it to establish his common plan, scheme or system which he uses.

ECF No. 7-9 at PageID.1260. Petitioner maintains that while the prosecutor could use the prior conviction to establish a common plan or scheme, he was not permitted to use it to establish

knowledge and intent. ECF No. 1 at PageID.49. Petitioner argues that as a result, this rebuttal statement was improper. *See id.* Not so.

The state courts properly rejected Petitioner's argument on this front. The state trial court explicitly ruled that Petitioner's prior conviction was admissible to prove knowledge, intent, and common plan or scheme during a pretrial motion hearing. *See* ECF No. 7-5 at PageID.464–65. So the Michigan Court of Appeals held that the prosecutor's argument was not prosecutorial misconduct because it was consistent with the trial court's ruling and with MICH. R. EVID. 404(b). *Sanders*, 2020 WL 7310511, at *7.

And the Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, federal precedent. Indeed, to constitute a due process violation, the prosecutor's conduct must have been "so egregious as to render the entire trial fundamentally unfair." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (citations omitted). "A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008). This is so regardless of whether the state court's ruling was correct. *Frazier v. Huffman*, 343 F.3d 780, 792 (6th Cir. 2003). Thus, because the prosecutor relied on the trial court's ruling, the rebuttal statement about Petitioner's prior conviction was not improper conduct. In other words, Petitioner has not shown that the state court's decision rejecting this claim was contrary to or an unreasonable application of *Darden*.

### 3. Appeal to Jurors' Civic Duty and Sympathy

Third, Petitioner argues that the prosecutor improperly appealed to the jurors' sense of civic duty and sympathy. ECF No. 1 at PageID.49–51. Specifically, he challenges the prosecutor's statement during the closing argument that drugs kill people, like the nephew of an excused prospective juror who died of a drug overdose. *Id.* Notably, Petitioner's attorney immediately

objected to this statement, and it was sustained, followed by a limiting instruction. *See Sanders*, 2020 WL 7310511, at *8.

The Michigan Court of Appeals held that the prosecutor's remarks were improper but did not warrant the reversal of Petitioner's convictions. *Sanders*, 2020 WL 7310511, at *8. The court reasoned that the remarks were "brief and isolated," and jurors were instructed to render a verdict solely on properly admitted evidence. *Id.* And jurors were explicitly instructed to "not let sympathy or prejudice influence [their] decision" and that "the [l]awyers statements and arguments and any commentary are not evidence." *Id.*

Against that backdrop, Petitioner is not entitled to relief on this claim. First, as the Michigan Court of Appeals recognized, the prosecutor's comments were isolated, not extensive, and were only a small part of the prosecutor's case and thus do not render "the entire trial fundamentally unfair," or warrant habeas relief. *Byrd v. Collins*, 209 F.3d 486, 532, 539 (6th Cir. 2000). Additionally, the trial court instructed the jury not to let sympathy or prejudice influence their decision, further supporting the Michigan Court of Appeals' decision. *See id.*; *see also Cockream v. Jones*, 382 F. App'x 479, 486 (6th Cir. 2010). At bottom, even if the prosecutor's comments were "undesirable or even universally condemned," *Darden*, 477 U.S. at 181, they were not "'so egregious so as to render the entire trial fundamentally unfair.'" *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979); *see also Byrd*, 209 F.3d at 529–39. So Petitioner has not demonstrated that the Michigan Court of Appeals' decision unreasonably applied or was contrary to federal precedent.

### 4. Vouching for Witnesses

Fourth, Petitioner argues that the prosecutor improperly vouched for law enforcement witnesses during closing and rebuttal arguments. ECF No. 1 at PageID.51–54. Petitioner cites the following three statements referring to law enforcement testimony:

> He said you all got lucky, but he didn't know what he was talking about. We didn't get lucky because of an expert in narcotics investigations combined with his compatriots who when you talk about the lieutenants and the detective sergeant and the other detectives, they were pushing almost a hundred years of law enforcement experience.

ECF No. 7-9 at PageID.1241.

> We got lucky because those drugs are off the street. We got lucky because we've got people like him, [Escott] ladies and gentlemen, who do their jobs every day. Get up on here, tell you about what happened, understand that they're under oath and they'll tell you what they did, how they investigated.

*Id.* at PageID.1246.

> Ladies and gentlemen, there are a few things that get me really fired up. I try to stay pretty calm, but what I don't like is when we want to get into a credibility contest with people that put their careers on the line and you know it when you come up here and they support it with evidence time and time and time again.

*Id.* at PageID.1255.

The Michigan Court of Appeals found none of these arguments improper. *Sanders*, 2020 WL 7210511, at *8. For the first two, the court held that it was not improper to summarize the officers' experience and expertise and that the officers testified under oath because the prosecutor did not imply any special knowledge about the officers' truthfulness. *Id.* And the court observed that the prosecutor's remarks were based on the officers' testimony about their experience and areas of expertise and did not constitute improper vouching. *Id.* For the third statement, the Michigan Court of Appeals held that, in context, the prosecutor's argument was not improper because he emphasized that the officers' testimony was supported by evidence and the argument was a direct response to defense counsel's attacks on the quality of the officers' investigation and evidence. *Id.*

Here, Petitioner has not shown that the state court's decision is contrary to, or an unreasonable application of, Supreme Court precedent. Importantly, it is not improper for a prosecutor to explore a witness's motive or qualifications for testifying that may bear upon

credibility determinations. *See United States v. Akins*, 237 F. App'x 61, 64 (6th Cir. 2007). And the prosecutor did not express a personal belief regarding the officers' credibility but instead stated that the testimony was supported by evidence. Thus, Petitioner has not shown that the prosecutor's statements referring to law enforcement testimony rendered the entire trial fundamentally unfair. Nor has he shown that the Michigan Court of Appeals failed to heed, or unreasonably applied, clearly established federal precedent.

### 5. Cumulative Effects

Fifth, Petitioner claims that the cumulative effect of the prosecutor's misconduct denied him a fair trial and due process. While the prosecutor's brief appeal to the jurors' sense of civic duty and sympathy may have been improper, as explained above, it did not impact the fundamental fairness of Petitioner's entire trial. And Petitioner's remaining prosecutorial misconduct claims lack merit. Thus, these errors cannot, by accumulation, amount to a due process violation.

### 6. Failure to Object to Prosecutorial Misconduct

Finally, Petitioners claims that his attorney was ineffective for failing to object to the prosecutor's misconduct. ECF No. 1 at PageID.30. The Michigan Court of Appeals denied this claim, reasoning as follows:

> [D]efendant asserts on appeal that counsel provided ineffective assistance by failing to object to the alleged instances of prosecutorial misconduct. But the majority of the arguments by the prosecutor—regarding AD, the other-acts evidence, defendant's admissions, and comments on witness credibility—constituted permissible argument, and defense counsel did not provide ineffective assistance by failing to raise meritless objections to these arguments. *See Putman*, 309 Mich. App. at 245. In comparison, the prosecutor exceeded the bounds of permissible argument by injecting the death of an excused juror's nephew, thereby raising a civic-duty argument involving issues broader than defendant's guilt or innocence. The record, however, also shows that defense counsel quickly and successfully objected to this line of argument, bringing a quick halt to the prosecutor's remarks. And as discussed, the brief improper comments did not affect the outcome of the trial given the jury instructions and the strong evidence of defendant's guilt. On this record, defendant has not shown that counsel's performance fell below an objective

level of reasonableness or that, but for counsel's performance, there was a reasonable probability of a different outcome.

*Sanders*, 2020 WL 7310511, at *9 n.10.

The Michigan Court of Appeals' denial of Petitioner's ineffective assistance of counsel claim for failing to object to prosecutorial conduct was not unreasonable or contrary to clearly established law. Again, all but one of the allegations of prosecutorial misconduct found no support in the record. And the one that saw some support—the prosecutor's civic duty and sympathy argument—Petitioner's attorney immediately and successfully objected to. *Id.* at *8. Thus, the Michigan Court of Appeals' determination that counsel was not ineffective on this claim was reasonable and consistent with the *Strickland* standard for ineffective assistance of counsel claims.

### C. Jury Array

In his fourth and final claim, Petitioner argues that he was denied his right to a jury drawn from a fair cross-section of the community. ECF No. 1 at PageID.55–59. He maintains that African Americans were underrepresented on his venire and have been systematically excluded from venires in Jackson County. *Id.* But these arguments lack merit.

The Sixth Amendment guarantees a defendant the right to a jury venire that is "designed to represent a fair cross section of the community." *Duren v. Missouri*, 439 U.S. 357, 363–64 (1979). To establish a *prima facie* violation of the fair-cross-section requirement, the defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364 (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)). "The Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself." *Ambrose v. Booker*,

684 F.3d 638, 645 (6th Cir. 2012). And Petitioner bears the burden of establishing each element of the *prima facie* fair-cross-section claim, including underrepresentation and systematic exclusion. *See Berghuis v. Smith*, 559 U.S. 314, 332 (2010); *Duren*, 439 U.S. at 364.

The Michigan Court of Appeals determined that Petitioner fell "far short of establishing the systematic exclusion of African Americans from the jury-selection process under prongs two and three." *Sanders*, 2020 WL 7310511, at *10. And the court carefully explained this conclusion:

> First, both defendant and the prosecutor focus on the composition of defendant's specific jury array rather than the composition of jury pools and venires over time as required under *Bryant*. *See* [491 Mich.] at 599–600. Defendant, for example, contends that to be representative of a fair cross section of the community, his venire, which he asserts had 50 people, should have contained four African-Americans but that there was only one African-American in the array. Factually, defendant's representations cannot be reconciled with the record. There was one African-American prospective juror who made it into the jury box for voir dire but who was struck by the prosecutor. But according to defense counsel's remarks at trial, there were three other African-American prospective jurors. In other words, it appears that defendant's array contained four African-Americans, which is the minimum number of African-Americans that defendant himself contends should have been in the venire in order to represent a fair cross section of the community.
>
> Moreover, defendant's focus solely on his own array is misplaced because whether representation of a distinct group is fair and reasonable requires evaluating venire compositions over time. Apart from discussion of his own array, defendant merely offers the unsubstantiated assertion that underrepresentation of African-Americans on jury venires has been "complained about" in other cases from Jackson County.[12] Defendant quotes the trial court as remarking that there are not "that many" African-Americans in the jury pools in Jackson County, making it "nearly impossible" to obtain a representative sample on a jury. But defendant provides no actual data regarding jury venires over time, and he makes absolutely no attempt to engage in any kind of statistical analysis to demonstrate that the representation of African-Americans on jury venires over time was not fair and reasonable. *See People v. Williams*, 241 Mich. App. 519, 526; 616 N.W.2d 710 (2000). Likewise, with regard to the third prong, defendant offers no evidence of the jury-selection process in Jackson County, and he certainly presents no evidence of anything inherent in that process that results in the "systematic" exclusion of African-Americans from Jackson County jury pools. Accordingly, defendant has failed to set forth a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement, and he is thus not entitled to relief on appeal.

---

[12] Defendant cites two unpublished decisions from this Court originating in Jackson County in which the defendants raised systematic exclusion challenges. In both cases, the challenges failed on appeal because the defendants did not present any evidence of systematic exclusion. Defendant does not explain how these cases, which like here lacked evidentiary support, aid his position.

*Sanders*, 2020 WL 7310511, at *10 (footnote in original).

The Michigan Court of Appeals' decision was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. It applied the correct standard, and Petitioner presents no evidence that other venires did not include a fair representation of African Americans. Nor does he demonstrate that the method used to draw the jury pool was designed to exclude African Americans. Rather, he claims that only one African American was part of his jury venire, when four should have been present. *See* ECF No. 1 at PageID.55–59. But as the Michigan Court of Appeals found, the record showed four African Americans in his jury array. *Sanders*, 2020 WL 7310511, at *10. And Petitioner does not rebut this finding. Additionally, as observed by the Michigan Court of Appeals, the two unpublished court of appeals decisions Petitioner cites do not support his contention because they held that defendants failed to establish a *prima facie* case that the jury pools represented an unfair cross-section of the Jackson County community or demonstrated systemic unfairness. *Sanders*, 2020 WL 7310511, at *10 n.12. Moreover, Petitioner has presented no evidence that other venires omitted a fair representation of African Americans, or that the method used to draw the jury pool was designed to exclude African Americans. *See generally* ECF No. 1 at PageID.55–59. Thus, the Michigan Court of Appeals' rejection of his claim was a reasonable application of and consistent with Supreme Court precedent.

Relatedly, Petitioner's claim that his trial attorney was ineffective for failing to object to the jury array, ECF No. 1 at PageID.27, is unfounded. To that end, because Petitioner did not demonstrate an unfair jury array claim, he has not demonstrated that his attorney was ineffective for not objecting to the jury array.

In sum, none of Petitioner's claims warrant habeas relief. Indeed, Petitioner has not demonstrated that the state courts' decisions unreasonably applied or were contrary to clearly established federal precedent. Thus, Petitioner's Petition for a Writ of Habeas Corpus, ECF No. 1, will be denied with prejudice.

## IV.

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation and quoting citation omitted).

Here, reasonable jurists would not debate this Court's conclusion that Petitioner is not entitled to habeas relief. Thus, a COA will be denied. Petitioner will also be denied leave to appeal *in forma pauperis* because an appeal could not be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V.

Accordingly, it is **ORDERED** that Petitioner Jermaine Sanders's Petition for a Writ of Habeas Corpus, ECF No. 1, is **DENIED WITH PREJUDICE**.

Further, it is **ORDERED** that a certificate of appealability is **DENIED.**

Further, it is **ORDERED** that leave to appeal *in forma pauperis* is **DENIED.**

**This is a final order and closes this case.**

Dated: August 12, 2025                      s/Thomas L. Ludington
                                             THOMAS L. LUDINGTON
                                             United States District Judge